## In Re American Legion Post No. 109

*Richard C. Snelbaker*, Assistant District Attorney, and *Harold S. Irwin, Jr.*, District Attorney, for petitioner.

*Mark & Mapel* and *C. Russel Welsh, Jr.*, for respondent.

SHUGHART, P. J., July 28, 1961. — Armed with search warrants, Pennsylvania State Police conducted simultaneous raids at numerous Cumberland County clubs, bars, service stations and other places on December 2, 1960, to search for unlawful gaming devices. One of the establishments searched was the American Legion Post No. 109 in Mechanicsburg where two State Policemen confiscated and removed from the premises four Bally DeLuxe Drawbell 5 Cent Slot Coin Machines which had no visible serial numbers but were identified and marked by the officers as CJS-1, CJS-2, CJS-3 and CJS-4 (N.T. 4); one (1) Bally Sportsman 25 Cent Slot Coin Machine, No. S-1053; one (1) Keeney Red Arrow 10 Cent Slot Coin Machine, No. KERA-326; and a number of punch boards and prizes which are not involved in this proceeding. Following the seizure, the machines were delivered to the custody of the District Attorney of Cumberland County who made arrangements for their storage. The machines described were reported to be owned by William George Magaro of 28 North Market Street, Mechanicsburg, Pa.

On February 21, 1961, a petition was filed by Detective Sergeant Robert L. McCartney which alleged that the above-described devices were unlawful gaming devices per se and requested that a rule be granted upon the owner and the legion post to show cause why the devices should not be destroyed. No answer was

filed to the rule by the legion post, but an answer was filed by William G. Magaro, David W. Magaro and Nelson F. Spangler, Jr., trading as Variety Amusements.

After the answer was filed, a hearing was held before the writer of this opinion on April 17, 1961. At this hearing, it was stipulated that the six machines were owned by Variety Amusements and that the machines then in court were the same machines seized in the raid December 2, 1960.

No evidence was offered at the hearing of actual use of any of the six machines for the purpose of gambling. The Commonwealth bases its petition for destruction on the premise that the machines in question are unlawful gaming devices in themselves and therefore are subject to destruction without proof of their actual use as gambling devices.

The Commonwealth relies upon section 60 of the Act of March 31, 1860, P. L. 382 18 PS §1445. This statute authorizes peace officers to seize and remove unlawful gaming devices when found. It provides that the officer thereafter shall make a return to the court of quarter sessions whereupon the court ". . . if satisfied that such device or machine was employed and used for the purpose of unlawful gaming as aforesaid, shall adjudge the same forfeited, and order it to be publicly destroyed . . ." The proceeding under the act is in rem: Commonwealth v. Blythe, 178 Pa. Superior Ct. 575, 578. The statute uses the words "employed and used," but it is not necessary for the destruction of such machines that actual gambling upon them be shown: Commonwealth v. Kaiser, 80 Pa. Superior Ct. 26. In that case, Judge Trexler said, at page 28:

"When the nature of the machine is shown to be such as fits them solely for an unlawful purpose, they

become in the language of some of the courts of other states 'outlaws'. They are not under the ordinary laws relating to personal property. The court can in a summary manner after their nature is disclosed to the satisfaction of the court, order their destruction so as to effectually prevent their use for the evil purposes for which they were designed."

This rule has recently been restated in American Legion Post No. 51 Appeal, 188 Pa. Superior Ct. 480, 490, affirmed 397 Pa. 430, appeal dismissed 363 U. S. 720, 80 S. Ct. 1596, 4 L. Ed. 2d 1521.

No arrests were made in this case, and no evidence of actual gambling was presented. It is the Commonwealth's contention that these machines were suited only for gambling purposes and, as such, are subject to seizure and destruction under the Act of 1860, supra, and the cases cited.

The principal witness presented by the Commonwealth was Dr. Daniel P. Detwiler, head of the Physics Department at Wilkes College, Wilkes-Barre, Pa. Dr. Detwiler was qualified by education and experience in the field of physics. He had studied machines of this type in his laboratory prior to a hearing in a similar case in Luzerne County and studied the machines involved here over a period of two days prior to the hearing. All of the machines involved were present in the court room. The four Bally DeLuxe Drawbell machines were identical in operation and construction, and the one identified as CJS-3 was used by Dr. Detwiler as a representative example of the four.

This machine was described as being a combination mechanical-electrical device. Play on this machine is initiated by inserting a coin which trips a relay that, in turn, unlocks the mechanical mechanism for play. The insertion of the coin is unnecessary to the operation of the machine except for the purpose of unlocking

it, and the machine can be operated internally without the use of the coin or its electrical replay mechanism. After the machine is unlocked, the operator then pushes a lever mounted on the front of the console cabinet. The push of the lever sets three reels in motion at varying speeds. These reels are marked with the same symbols and in the same manner as the reels on the well-known "one-armed bandits." The object of the operation is to light up the symbols on the reels in various combinations for which scores are given and for which the operator is given the privilege of replay without further insertion of money. The reel mechanism is entirely mechanically operated. Once the reels are started in motion, they rotate freely on a shaft and are stopped by mechanical arms which stop each reel in succession. The reels rotate at varying speeds and for varying periods of time in relation to each other. The stopping mechanism does not operate in predetermined sequence, but strictly at random, thus defying predictability by the operator.

After the mechanical portion of the machine is activated, various electrical systems come into operation for scoring and counting. When winning combinations appear on the reels, electrical circuits are energized causing lights to flash scores on a "game won" meter on the front of the machine.

Dr. Detwiler testified that the operator of the machine had absolutely no control over the outcome of his playing. Control could not be exercised in any way by the insertion of the coin for this act only unlocked the machine. Likewise, no finesse in pushing the lever could affect the workings of the machine because it operated in a tripping fashion.

The only other area in the operation of the machine in which the operator participates concerns the "holding" mechanism. After an operator has played the

machine once and a combination appears on the reel, the operator may by the insertion of another coin, or by using a free game if he has one, hold one or more of the reels from spinning and again put the machine into operation. The object of this is to permit the operator to hold over what he feels is an advantageous symbol from the previous play for the next, thereby apparently enhancing his chance of getting a better combination.

Dr. Detwiler testified that although the odds in favor of a winning combination are increased mechanically by holding one or more reels, there is no element of skill involved, because the remaining reels are operating in a purely random fashion. Normally, the privilege to hold a combination exists for only one subsequent play. However, this operation is modified to some extent by the existence of an "extra draw star" which is awarded in a strictly random fashion, and, when it appears on the machine, the operator may hold the combination for more than one play.

While it is obvious that the player can exercise no control over the combinations that appear, the owner of the machines can modify the combinations of symbols on the reels to increase or decrease the mechanical chance of winning sequences appearing. This can be done by replacing the reels. By the changing of the positions of multi-pronged plugs, the owner can control the number of times the "extra draw star" will appear. By the use of similar plugs, the number of free games awarded for a jackpot can be changed.

The change in denomination of coins that are used to activate one of these machines can be made in a very short time. The coin receiving mechanism slips into a holder secured by a series of clamps. By changing this mechanism the machine can be changed in a few minutes time from a nickel machine into a dime or quarter machine.

The Commonwealth also introduced evidence to show that these Bally machines could be readily converted into actual coin payout machines by the insertion of attachable units into the machine. There was no error in the admission into evidence of certain manuals and diagrams that were prepared by the manufacturer of the machines for the purpose of enabling the expert witness to demonstrate how the machines could be converted to actual payout machines. It is obvious that these manuals pertain to the type of machine involved here and they were used solely to enable the witness to more clearly demonstrate to the court the convertibility of the machines.

These machines contain two meters which were inside the cabinet and not visible to the operator. One meter could be used either to count and record the number of jackpots on the machine or count and record the number of free games cancelled from the machine. The other meter could record either the number of games played or the number of wins awarded. Neither of these meters is in any way important or essential to the operation of the machines, and the machines would work equally well with or without these meters. On the back of the Bally machine was a switch through the operation of which free games appearing on the machine could be cancelled. The same effect of "knocking off" the free games could be accomplished by disconnecting the plug to the machine and then replacing it. Dr. Detwiler testified that the operating time of the machine was 3.5 seconds, which would allow approximately 1,000 plays per hour.

The Bally Sportsman machine has three vertical columns of pictures of animals instead of the reels that are in the Drawbell machines. The object of this machine is to light up various combinations of animals

which award the right to varying numbers of replays. After a coin is inserted in this machine, it is activated by pushing a switch on the front of the machine. This machine is electrically powered and runs its course without effort or control of the operator after the "play" button is pushed. It, too, contains a randomizer which destroys any predictability of sequence of results. As does the Drawbell machine, this machine has a "hold" feature which may be utilized by the deposit of another coin or use of a free game. It also has an "extra hold" device such as described for the Drawbell machines.

The inside of the machine contains a number of plug devices which can be moved by the owner of the machine in such a way as to control its functions so as to make the machine more or less generous in producing free games. The coin receiver on this machine is also interchangeable so as to change the denomination of coin required to operate it. This machine contains two internal counters or meters. One records the number of coins deposited and the second records the number of free games cancelled. Neither is essential to the operation of the machine. On the back of this machine there was a switch which could be used to cancel the free games won. Dr. Detwiler testified that eight seconds were required to accomplish one complete cycle on this machine and that it would be possible to play approximately 450 games an hour.

The Kenney Red Arrow machine begins operation by the insertion of a coin which readies the machine for the tilting or pushing of a center balance horizontal lever. This, in turn, closes a switch which sets the internal mechanism into action. The operator then watches a series of three flashing squares which display various symbols in rapid succession. The last remaining symbols in these squares tell the operator

the result. Diagrams on the front of the machines show what combinations are winners and the number of free games won. No control over this machine can be exercised by the operator either in the manner of depositing the coin or in operating the lever which is simply an electrical switch. There is no "hold" mechanism on this machine and once the "play" lever is pushed, the mechanism runs independent of the operator. The operation of this machine is controlled by a randomizing feature which destroys any predictable order of symbol occurrence.

A rotary switch on the back of this machine permits the owner to control the operation of the machine. By merely turning a knob, the owner can affect the generosity of the machine insofar as the frequency in which winning combinations will appear. Further, by changing electrical connections, it is possible to increase or decrease the frequency with which the jackpot combination appears.

This machine also has an interchangeable coin-receiving mechanism, a simple means of changing the price of operating the machine. The machine has two meters or counting devices, one which counts the number of coins inserted in the machine and the other the number of free games or replays cancelled. These meters are not necessary to the operation of the machine. Free games are "knocked off" on this machine by disconnecting the machine from its power supply and then reconnecting it again. One complete operation of this machine requires five seconds, and it is therefore possible for the operator to complete in excess of 700 games or plays per hour.

None of these three machines contained any vacuum tubes and, therefore, cannot be considered as electronic devices. In the Bally Sportsman and Kenney Red Arrow machines the mechanism is powered by

electricity, while in the Bally Drawbell machines, electricity merely unlocks the mechanism for manual operation.

Unfortunately, there is no available legislative definition of a gambling device. Sections 603, 604 and 605 of The Penal Code of June 24, 1939, P. L. 872, 18 PS §§§4603, 4604 and 4605, are the only legislative pronouncements on the subject.

Section 603 provides, inter alia:

"Whoever maintains any gambling device or apparatus, to win or gain money or other property of value, . . ."

Section 604 provides, inter alia:

". . . any punch board, drawing card, slot machine, or any machine or device used or intended to be used for gambling, . . ."

Section 605 provides, inter alia:

"Whoever sets up or establishes, or causes to be set up or established, any game or device of address, or hazard, at which money or other valuable thing may or shall be played for, or staked or betted upon: . . ."

There is likewise no rule that has been enunciated by our courts which lends itself to a ready determination of what constitutes a gambling device. A number of the characteristics of the machines under consideration here have been held by the courts to constitute some evidence that similar machines were gambling devices. We, therefore, make the following findings in respect to these machines:

1.

All of the machines in question operate entirely by chance, and there is absolutely no element of skill involved over the outcome of the play on the machine. In Wigton's Return, 151 Pa. Superior Ct. 337, 344 the court said:

"Since normally people do not play games of *pure chance* for recreation or amusement without betting on the outcome such proof would be some *evidence* of their use for unlawful gaming." (Italics supplied.)

As suggested by Judge Campbell in Commonwealth v. Two Gambling Devices, 1 Centre 181, this element of chance should be enough in itself to label the machines as unlawful gaming devices, although such has never been held.

2.

In each of the machines, the denomination of the coin used to activate the machine can be varied by the owner by a simple interchange of a coin-receiver unit. As stated by the assistant district attorney in his excellent brief, it is difficult to understand how anyone could derive any more pleasure out of playing a game of skill or chance for a quarter when the same machine could be played for a lesser amount by the simple expedient of changing one part of the machine. It is obvious that this feature of the machine lends itself only for use as an unlawful gaming device. As the Superior Court said in American Legion Post No. 51 Appeal, supra, at page 489:

"If free games are all that can be won it is difficult to understand why there should be a difference in price charged for playing the machine."

In the instant case, the police officer testified that all six machines were found in the same room on the premises and all were set up for operation. The Drawbell machines were set up for using nickels, the Red Arrow for dimes and the Sportsman for quarters. If free games were the only things that could be won, it is difficult to understand why there should be a difference in price charged for watching the machines operate for less than 10 seconds.

### 3.

Five of the six machines involved here were equipped with buttons or switches at the back of the cabinets that could be used to cancel the free games that the operator had won. In the remaining machine, the Red Arrow, the free games could be cancelled by simply removing and replacing the power plug in the electrical outlet. If free games were the only thing to be won in these machines, it is difficult to understand why this accessory to the machine was necessary. It is obvious that this attachment would be of considerable utility if the machine were used as a gambling device. Such a mechanism on the machine to cancel the free games is evidence of an unlawful gaming device: Urban's Appeal, 148 Pa. Superior Ct. 101, 113.

### 4.

All of the machines contained meters for counting various operations or functions of the machines. In all cases, the meters either directly reported the number of free games cancelled or could be connected so to do. These meters could serve no purpose except to indicate to the owner how many free games had been cancelled in return for a tangible reward. If the machines were used solely for amusement, this attachment, which had nothing to do whatsoever with the operation of the machine, would be unnecessary. Such counting and metering devices constitute some evidence that the machines are unlawful gaming devices: Urban's Appeal, supra; American Legion Post No. 51 Appeal, supra.

### 5.

By a minor adjustment in these machines, the owner could control the degree of game difficulty and increase or decrease the chances of winning. A machine used merely for recreation would scarcely have

need for such an intricate adjustment system. This aspect of all machines is evidence of their unlawful purposes: American Legion Post No. 51 Appeal, supra; Commonwealth v. Two Gambling Devices, supra.

### 6.

The four Drawbell machines were so designed that they could be readily converted into actual coin payout machines. Although none of the machines involved here were actually so equipped, the fact that they could be so changed is evidence of their being gambling devices: Mills Novelty Company's Appeal, 316 Pa. 449, 457.

### 7.

These machines are complete within themselves, and neither the operator nor anything else can decide whether or not free games are won. This feature likewise has been held to constitute evidence that a machine is an illegal gaming device: Urban's Appeal, supra; Commonwealth v. Two Gambling Devices, supra.

### 8.

Five of the six machines were equipped with a mechanism to permit the operator to hold a part of the results of a previous play either upon using a free game or upon depositing another coin. While this operation appears to increase the chances of winning, it requires additional expenditures by the operator. In this respect, the machine is similar to the "multiple-coin" pinball machine which was held illegal per se in American Legion Post No. 51 Appeal, supra.

### 9.

The longest period required to complete a play on any of the machines was eight seconds while only 3.5 seconds was required to complete a play on the Draw-

bell machines. It is, therefore, possible to play between 450 to 1,000 plays per hour on these machines. If the machines were equipped to receive nickels, the operator could amuse himself for one hour by the expenditure of $20 to $50 if he did not win any free games. In American Legion Post No. 51 Appeal, supra, at page 490, there was testimony that a witness had lost $86 during one day playing a machine and gave up playing the machines when her total loss amounted to $3,000. A player could do as well on any of the machines here involved. While the play on all of these machines was accompanied with the flashing of multicolored lights and symbols, it is difficult to see how the average person would engage in this as a pastime for sheer amusement. Respondents contend that these machines can be used for amusement and recreational purposes, but it is significant that they did not offer any evidence in support of this contention. We feel that the extreme brevity of time consumed in the operation of these machines is evidence to support the finding that they are gambling devices per se.

It is generally accepted that gambling consists of three elements; a consideration, an element of chance and a reward: Commonwealth v. Two Gambling Devices, supra. It is readily apparent from what has been stated above that all of the machines here involved the first two elements. Counsel for respondents relies upon the decision of the court in Wigton's Return, supra, as authority for the proposition that the free games provided by playing these machines does not constitute a thing of value under the sections of The Penal Code referred to above.

In the Wigton case, the court was concerned with the destruction of pinball machines. These machines contained no devices for cancelling free games, nor did they contain meters for recording the count of free games cancelled. We feel that the decision of the

586

court in that case must be interpreted in the light of its facts. We do not feel that the decision is binding in the instant situation. While it is true that the ostensible reward in this case was free games, the presence of the meters to record the number of free games "knocked off" and the ready adaptability of the machines to receive coins of varying denominations are such additions to the free game feature as to admit of a conclusion that this reward does constitute a thing of value and therefore render the machines gambling devices per se. See American Legion Post No. 51 Appeal, supra, page 491.

Accordingly, we find that the devices and machines listed are essentially and inherently gambling devices used and intended to be used for unlawful purposes and, therefore, subject to forfeiture and destruction.

*Order*

And now, July 28, 1961 at 1:45 p.m., the rule heretofore issued is made absolute and the district attorney is directed to present an appropriate order to the court providing for the destruction of the machines. An exception is noted for the respondents.